**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

LEILA TARANTINO,

                              Plaintiff,

vs.                                                    Case No. 5:12-cv-434-Oc-32PRL

CITRUS COUNTY GOVERNMENT,
SHERIFF JEFFREY J. DAWSEY, in his
individual and Official capacity as an agent
for Citrus County Government, SERGEANT
STEPHEN CONLEY, DEPUTY ANDRA
CANFIELD, DEPUTY THOMAS INDORADO,
DEPUTY NICK HESSE in their individual and
Official capacities as agents for Citrus County
Government,

                              Defendants.

_____

## ORDER

        Defendant Citrus County Sheriff's Deputy Thomas Indorado pulled over plaintiff Leila

Tarantino in a residential neighborhood in the early evening of Sunday, July 17, 2011.

Indorado recognized Tarantino as the same person he had recently stopped for driving under

the influence and he suspected her license was still suspended.  While Indorado was back

in his patrol car checking the paperwork Tarantino had handed him, another officer,

defendant Sergeant Stephen Conley, had arrived at the scene and, observing Tarantino's

hand reach into her shirt, ordered her at gunpoint to raise her hands and get out of her

vehicle.  One of the officers removed Tarantino from the car and handcuffed her.  Tarantino

states she was placed in the back of Indorado's patrol car where she remained handcuffed

for a lengthy period during which she was denied access to her two small children (ages one

and four at the time) who were in her vehicle.  Additional law enforcement officers, including

defendant Deputy Nick Hesse, arrived and remained on the scene, including, eventually,

defendant Deputy Andra Canfield, who was summoned upon Indorado's request that a

female officer be dispatched to execute a patdown search of Tarantino.  When Canfield

arrived, Tarantino says Canfield ordered Tarantino to get out of Indorado's patrol car after

which Canfield performed a patdown search, and, according to Tarantino, ordered Tarantino

to remove all of her clothing in public view while motorists drove by and deputies looked on.

Then, after permitting her to get dressed, Canfield ordered her to remove all of her clothing

once again, whereupon Canfield forcibly removed a tampon from Tarantino's vagina.  No

contraband was found on Tarantino or in her vehicle; she received a citation for violating the

restrictions on her suspended license before being released approximately two hours after

the traffic stop began.

     After two rounds of pleadings,[1] Tarantino is now suing four law enforcement officers

(Deputy Indorado, Sergeant Conley, Deputy Hesse and Deputy Canfield) for violating her

Fourth Amendment right to be free of unlawful search and seizure (Count I), for battery

(Count III), and for intentional infliction of emotional distress (Count IV).  The four each seek

---

[1]The operative complaint is Doc. 19 but an Order entered thereafter (Doc. 52) dismissed some of the claims therein.  Although Citrus County and Sheriff Jeffrey J. Dawsey are named in that filing, they have been dismissed along with Counts II and V which named them. Additionally, plaintiff's Count I claim as it arises under the Ninth or Fourteenth Amendment is dismissed as is any official capacity claim against any defendant– Count I therefore remains as a section 1983 action against the four remaining officers for violations of Tarantino's Fourth Amendment rights.  See Order, Doc. 52 adopting Report and Recommendation, Doc. 49.  (This Order gave Tarantino the option to seek further amendment but she did not attempt to do so and the four remaining defendants answered the amended complaint; see Doc. 53.)

summary judgment in whole or in part.  As discussed below, Tarantino concedes that some of the officers are not liable as to some of her claims.  The parties filed briefs, supplemental authority, depositions and affidavits in support of their respective positions (see Docs. 54, 55, 56, 57, 64, 81, 88), and the Court heard oral argument on the motions on May 9, 2014, the transcript of which (Doc. 84) is incorporated by reference.

## I.      Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case.  An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014) (quotation and citation omitted).  The Court "must view all evidence and reasonable inferences in the light most favorable" to the non-moving party; however "the mere existence of a scintilla of evidence in support of [that party's] position will be insufficient."  Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC, 702 F.3d 1312, 1316 (11th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## II.     Discussion

### A.      Count I: Section 1983 Fourth Amendment Claim

All four officers argue they are protected by qualified immunity as to Count I in at least some respect.  The Supreme Court recently vacated a decision in a section 1983 action based on alleged violations of the Fourth Amendment, because the district court failed to view the evidence at summary judgment in the light most favorable to the non-moving party

when holding that police actions did not violate clearly established law. <u>Tolan v. Cotton</u>, 134

S.Ct. 1861 ( 2014):

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right [.]" <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures.  <u>Graham v. Connor</u>, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  The inquiry into whether this right was violated requires a balancing of " ' the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " <u>Tennessee v. Garner,</u> 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); <u>see</u> <u>Graham</u>, <u>supra</u>, at 396, 109 S.Ct. 1865.

> The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " <u>Ibid.</u> "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." <u>Id.,</u> at 741, 122 S.Ct. 2508.

> Courts have discretion to decide the order in which to engage these two prongs. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).  But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.  <u>See</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 195, n. 2, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ( <u>per curiam</u>); <u>Saucier</u>, <u>supra</u>, at 201, 121 S.Ct. 2151; <u>Hope,</u> <u>supra</u>, at 733, n. 1, 122 S.Ct. 2508.  This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson [v. Liberty Lobby, Inc.]</u>, 477 U.S. [242], at 249, 106 S.Ct. 2505.  Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a).  In making that determination, a court must

view the evidence "in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); see also Anderson, supra, at 255, 106 S.Ct. 2505.

Tolan, 134 S.Ct. at 1865-66.

In Count I of her amended complaint, Tarantino claims that her Fourth Amendment rights to be free from unlawful frisk, restraint, detention, assault with a deadly weapon, and strip search were violated by the four officers.  See Doc. 19 at ¶ 26.  Although charged together in this single count, Tarantino acknowledges that the officers were not all present for the duration of the stop and are not all liable for each aspect of her section 1983 claim. In a case such as this, it is appropriate (and consistent with the parties' presentations) to discretely examine each progressive stage of the stop and search to determine whether the facts, taken in the light most favorable to Tarantino, establish that a constitutional violation was committed by any of these officers.  See Brent v. Ashley, 247 F.3d 1294, 1299 (11th Cir. 2001) (stating that facts of case, which involved several stages, should be examined as a series of discrete occurrences for purposes of determining whether a constitutional violation has been demonstrated).  If the answer to that question is yes, then the Court will consider whether the right was "clearly established at the time of the violation" such that the officers' shield of qualified immunity should be lifted.[2]  Tolan, 134 S.Ct. at 1866 (quotations and citations omitted).

---

[2]The protection of qualified immunity is available to "government officials acting within their discretionary authority."  Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (citations omitted).  Tarantino does not dispute that all the officers were engaged in discretionary duties at the relevant time.  See Doc. 64 at p.8.

**1. Detention following the initial traffic stop/**
**Detention and assault with a deadly weapon**

Tarantino alleges that Indorado and Conley (but not Canfield or Hesse) unlawfully

restrained her beyond the initial stop[3] when they removed her from her vehicle "without . .

. having a reasonable belief or probable cause that [Tarantino] possessed drugs, weapons,

or contraband," and that Sergeant Conley "assault[ed her] with a deadly weapon."  Doc. 19

(Amended Complaint) at ¶ 26.[4]  Tarantino testified at her deposition that when Conley drew

his gun, she was not attempting to conceal anything and had nothing in her hands.  Doc. 54-

5 (Tarantino Depo) at Transcript ("Tr.") 63-68.  Tarantino does, however, admit that her hand

was in her shirt as she was adjusting her bra strap.  Id. at Tr. 66.  Conley likewise stated that

Tarantino put her hand inside the front of her shirt, which prompted him to draw his firearm

and direct her to raise her hands where he could see them.  Doc. 54-2 (Conley Affidavit) at

¶¶ 8-10.[5]  Conley's appearance at the passenger side of Tarantino's vehicle apparently

---

[3]Tarantino acknowledges that in recognizing her as a person whose license was recently suspended, Indorado had a basis to execute the traffic stop.  See Doc. 84 (transcript of oral argument) at Tr. 37.  Indorado states that between the moment he recognized her and the time he pulled her over, Tarantino also failed to come to a complete stop at a stop sign, which Tarantino disputes.  However, because Tarantino agrees that Indorado's recognition of her created a sufficient basis to execute a traffic stop, the dispute regarding whether she committed any other traffic violation is not material for purposes of deciding this motion.

[4]See also, Doc. 64 (plaintiff's consolidated responsive brief on summary judgment) at p.10: "Defendants Indorado and Conley, after the initial traffic stop by Defendant Indorado, unconstitutionally restrained and detained Plaintiff by removing her from her vehicle for a search without reasonable suspicion that she was armed or dangerous.  Furthermore, Defendant Conley unlawfully seized Plaintiff with his weapon and assaulted her with his weapon."

[5]Conley also testified that Tarantino was looking in her mirror watching Indorado as he approached his car, leading Conley to believe she was watching to be sure Indorado did not

6

surprised her and Conley stated (without dispute) that she did not immediately comply with his command to raise her hands.  Id. at ¶¶ 9-10.  See also, Doc. 54-5 at Tr. 62 (Tarantino testifying that Conley came "out of no where [sic]").  Conley continued to point his gun at Tarantino as he circled around the front of her car, continuing to order her to raise her hands. Doc. 54-2 at ¶ 10.  Hearing Conley's commands and seeing that Conley had drawn his firearm, Indorado left his vehicle and approached Tarantino's, at which point Conley told Indorado that he suspected Tarantino was concealing something.  Doc. 54-3 (Indorado Affidavit) at ¶¶ 11-12.  Tarantino stated that Conley put his gun away once she put her hands up, which she did by the time he reached her side of the car.  Doc. 54-5 at Tr. 80-82.  As Tarantino explained, "he holstered it once my hands were up and he seen I was not doing anything illegal," which happened before she got out of the car.  Id. at Tr. 80.  Tarantino reported that Conley then removed her from her car, put her in handcuffs and, after discussing whether a piece of a plastic bag had fallen out of her car, she was placed in the back seat of Indorado's patrol car.  Id. at Tr. 69, 82.[6]  At this point, Indorado requested that

---

see what she was doing. Doc. 54-2 at ¶ 8.  Tarantino disputes that this happened (Doc. 54-5 at Tr. 63) and the Court therefore does not consider it as part of the calculus in Conley's decision making.  Cf. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").

[6]Indorado and Conley report that Indorado removed Tarantino from her car, not Conley, but that dispute is not material.  Doc. 54-2 at ¶¶ 11, 13; Doc. 54-3 at ¶¶ 12, 14.  On a more important point, Indorado and Conley both claim that they observed a small piece of a plastic bag fall to the ground from the interior of Tarantino's car when the door was opened.  Doc. 54-2 at ¶ 11; Doc. 54-3 at ¶ 12.  Both officers stated the bag was consistent with the possible transportation of narcotics and Conley field tested the bag for cocaine and methamphetamine; the results were negative.  Doc. 54-2 at ¶ 12; Doc. 54-3 at ¶ 13. Tarantino denies anything fell from inside her car although she admits that pieces of plastic bags and cellophane wrappers were strewn about in the road near her car.  See Doc. 54-5

a female deputy be dispatched to the scene to conduct a patdown search of Tarantino.  Doc. 64-2 (Indorado Depo) at Tr. 41.

On this record, the Court finds Tarantino has failed to present a triable issue of disputed fact as to whether the officers unlawfully detained Tarantino beyond the initial traffic stop and whether Conley had a lawful basis to draw his firearm and keep it pointed at Tarantino until she complied with his order to raise her hands.  Tarantino stated that she assumed Conley thought she had drugs in her possession and that was the reason he pulled the gun on her.  Id. at Tr. 77.  Conley stated that when Tarantino failed to raise her hands in response to his command, he did not know if she was reaching inside her shirt for a weapon or was concealing drugs or other contraband.  Doc. 54-6 (Conley Depo) at Tr. 14-15, 61; Doc. 54-2 at ¶ 9; Doc. 64-2 at Tr. 39 (Indorado stating that a "pea shooter" firearm fits inside a bra).  At oral argument, Tarantino's counsel conceded that Tarantino having her hand inside her shirt gave Conley a lawful basis to remove Tarantino from her car.  Doc. 84 at Tr. 38.  Although Tarantino reported that Conley pointed his gun at her for one or two minutes, she further stated that he holstered the gun as soon as she raised her hands.  Doc. 54-5 at Tr. 81-82.

_____

at Tr. 70-77.  For purposes of deciding the motion, the Court accepts Tarantino's version on this point.  Therefore, the possible existence of a plastic bag that fell from Tarantino's car does not contribute to the Court's consideration of whether the officers lawfully detained Tarantino following the initial traffic stop.  Although the presence of pieces of plastic on the ground near the car might be enough to raise the officers' suspicions, because their testimony is that their suspicions were raised by seeing the piece of plastic bag *fall from her car* (which Tarantino disputes happened), the Court cannot parse out whether the presence of bags on the ground alone would otherwise have contributed to the officers' reasonable suspicion and therefore does not consider this evidence.

8

While "a routine traffic stop for a traffic citation does not, in and of itself, give rise to a valid reason or authorization for a frisk," Hatcher v. State, 834 So.2d 314, 317 (Fla. 5th DCA 2003) (quotation and citation omitted), during the course of an otherwise legal traffic stop, officers have a " duty to investigate suspicious circumstances that then come to [their] attention." United States v. Parker, 512 Fed. App'x 991, 992 (11th Cir. 2013) (citing United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991). Additionally, "traffic stops are especially fraught with danger to police officers" and "[t]he risk of harm to both the police and the occupants of a stopped vehicle is minimized" "if the officers routinely exercise unquestioned command of the situation." Arizona v. Johnson, 555 U.S. 323, 330-31 (2009) (quotations and citations omitted). See also United States v. Hastamorir, 881 F.2d 1551, 1556-57 (11th Cir. 1989) (holding that officers' use of handcuffs and drawing a weapon were reasonable actions for safety of officers and did not convert Terry stop into an arrest); State v. Perera, 412 So.2d 867, 871 (Fla. 2d DCA 1982 ) ("We know of no authority which limits the right of police to display a weapon where necessary to make a stop."). Thus, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Arizona, 555 U.S. at 331 (quotations and citations omitted). While an officer may only have probable cause to believe a driver has committed a minor traffic violation, "the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a [traffic] violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." Id. (quotations and citations omitted). Thus, if an officer harbors reasonable suspicion that vehicle occupants

9

stopped for a traffic offense are armed and dangerous, the officer may subject them to a frisk or patdown.  Id. at 327.  Whether an officer is justified in believing that criminal activity may be afoot is examined from the totality of the circumstances.  United States v. Cortez, 449 U.S. 411, 417-18 (1981).

Here, Conley, a community crimes detective at the time with ten years' experience, had responded as a back up officer to a traffic stop Indorado was conducting.  While Indorado was in his vehicle examining Tarantino's paperwork,[7] Conley observed Tarantino putting her hand inside her shirt.  Not knowing what she was doing, Conley drew his firearm and told her to raise her hands.  Tarantino was surprised by his presence and did not immediately follow his command, further raising his suspicion that she was concealing something, which might have been a weapon or drugs.  Tarantino continued to ignore Conley's command and her hands remained out of his sight for "a minute or two" as he shouted at her to raise her hands while circling around the front of her car.  At this point Conley had been joined by Indorado, who knew he was dealing with a driver in a high crime area, who was possibly driving on a suspended license, who had recently been driving while under the influence, and who Conley now reported was potentially concealing a weapon or drugs in her shirt.  As soon as Tarantino raised her hands so Conley could see them, he

---

[7]Before he stopped her, Indorado had confirmed that Tarantino's license was suspended by running her license plate number through his FCIC/NCIC system.  Doc. 54-3 at ¶ 7. When he asked for her license, registration, and proof of insurance, Tarantino presented a piece of paper that turned out to be a "business purposes only" license, which authorizes the holder of a suspended license to drive for certain business purposes.  See Fla. Stat. § 322.271(1)(c)1.  Indorado had only seen a few of these and wanted to verify its information and authenticity.  Doc. 64-2 at Tr. 23-29.

holstered his weapon.  Tarantino was then placed in handcuffs in anticipation of a patdown search.  These undisputed facts do not support any inference that Tarantino's Fourth Amendment rights were violated by Conley drawing his gun and ordering her out of the car, or by his or Indorado's decision to place her in handcuffs to await a female deputy to conduct a patdown search.[8]  As no constitutional violation occurred with regard to the initial detention or Conley's use of his firearm, both Conley and Indorado are entitled to summary judgment as to this stage of the traffic stop.

### 2.      Length of Detention

Although her amended complaint challenges the detention as being "disproportionate," in responding to the summary judgment motions, Tarantino clarifies that what she is challenging is its duration, claiming that Indorado and Conley (but not Canfield or Hesse) are liable for unlawfully prolonging Tarantino's detention.  <u>Compare</u> Doc. 19 (Amended Complaint) at ¶ 26, <u>with</u> Doc. 64 (Consolidated Response) at p. 12.  In total,

---

[8]Thus, the undisputed facts here are in contrast to those presented by <u>Baptiste v. State</u>, 995 So.2d 285, 295 (Fla. 2008), (cited by plaintiff), where officers ordered a man to the ground at gunpoint based on nothing more than an anonymous tip regarding a black man in the area wearing a white t-shirt and blue jean shorts who had waved a gun.  In <u>Baptiste</u>, the Florida Supreme Court noted that if the officers had observed additional suspicious behavior, such as if the suspect had reached for his waistband upon seeing the officers, or if he had acted nervously, a <u>Terry</u> stop would have then been justified.  <u>Id.</u> at 297-98 (citing facts of <u>United States v. Gooden</u>, 273 F.3d 1100, 1100, 2001 WL 1075851 (5th Cir. 2001) (unpub. opinion) and <u>United States v. Sims</u>, 296 F.3d 284, 285 (4th Cir. 2002).  Like the defendants in <u>Gooden</u> or <u>Sims</u>, by putting her hand inside her shirt and by ignoring Conley's command to show her hands, Tarantino created additional suspicion which, when combined with what Conley and Indorado already knew, warranted her removal from the car and the patdown search.

Tarantino was held for approximately two hours[9] while her two young children remained in or near her car for a traffic stop that eventually ended in a citation and in which no contraband was ever found.

There is no bright line rule or rigid time limit defining the outer bounds of a lawful traffic stop. United States v. Purcell, 236 F.3d 1274, 1278-79 (11th Cir. 2001) (citing United States v. Sharpe, 470 U.S. 675, 685 (1985)).   Rather, as with other aspects of Fourth Amendment jurisprudence, the touchstone is "reasonableness" based on the "totality of the circumstances." Id. While the duration of a traffic stop generally may not exceed the time necessary for an officer to safely process the traffic violation, when the officer gains reasonable suspicion of other illegal activity, the stop may be prolonged. United States v. Perkins, 348 F.3d 965, 969-70 (11th Cir. 2003).   However, a stop otherwise authorized by Terry may ripen into a full-scale arrest unsupported by probable cause if the stop is not sufficiently limited in scope and duration. United States v. Hardy, 855 F.2d 753, 758-59 (11th Cir. 1988).   Thus, the duration of the stop is considered in the context of "the law enforcement purposes served by the detention, the diligence with which the police pursue

_____

[9]Tarantino refers to the stop as lasting for "two hours." See Doc. 19 (Amended Complaint) at ¶ 6; Doc. 54-5 (Tarantino Deposition) at Tr. 168.  The officers' movements were logged on the department's computer-aided dispatch ("CAD") program.  The parties engaged in much discussion during the officers' depositions as to how the CAD system operated and whether its notations represented the actual times events occurred or reflected the times that a dispatcher recorded the events. See, e.g., Doc. 64-2 (Indorado Deposition) at Tr. 42.  According to the CAD report, Indorado radioed dispatch at 6:16 p.m. to notify the department he was executing a traffic stop and he notified the department he had issued a citation and the stop was over at 7:50 p.m., indicating the stop lasted for an hour and thirty-four minutes. Id. at Tr. 21, 62.  While Tarantino made clear she was making estimates of the time, because the parties questioned the accuracy of the CAD records, the Court presumes for purposes of deciding the motions that she was detained for approximately two hours.

the investigation, [and] the scope and intrusiveness of the detention." Id. at 759.

While the entire stop lasted (in Tarantino's view) for two hours, the initial moments, discussed above, were not of unreasonable duration under the Fourth Amendment. Once Tarantino was placed in Indorado's car, she stated that the officers spoke with each other but she did not overhear their conversations. Doc. 54-5 at Tr. 78. Indorado explained that after Tarantino was secured in his car, he contacted his dispatcher to request that a female officer report to the scene to conduct a patdown search of Tarantino. Doc. 64-2 at Tr. 41-42.[10] Both Indorardo and Conley state that they believed Tarantino may have been concealing drugs or a weapon in her shirt. Doc. 54-2, ¶ 9, Doc. 54-3, ¶ 15. Conley testified that until Canfield conducted the search of Tarantino, he did not know what the officers were dealing with. Doc. 54-6 at Tr. 54. During the time the officers were waiting for the female deputy to arrive, Tarantino's car was searched,[11] her older child (the four year old) became upset, but then was comforted by some nearby residents (strangers to Tarantino), and

---

[10]In her response to the summary judgment papers, Tarantino, relying on the CAD records, says it took officers nearly forty minutes to call dispatch to request a female deputy. Both Indorado and Conley say the call for Canfield was made within minutes of the stop and that the time reflected in the CAD was likely when the dispatcher either called or reached Canfield. Doc. 64-2 at Tr. 42-45; Doc. 54-6 at Tr. 43-38. Tarantino herself did not offer testimony that would contradict the officers. Conley testified that not all calls between officers are logged in the CAD and that Canfield's history for that day (which is not of record) might reveal more accurate information. Doc. 54-6 at Tr. 46-49.

[11]The extent of the search is disputed but is not material to this decision. Tarantino testified that the search of her vehicle was "routine" based on the officers' knowledge that she had a past marijuana charge and a DUI so she had "no problem" with the search of her vehicle. Doc. 54-5 at Tr. 98. Her amended complaint does not challenge the lawfulness of the search of her car. The officers state that they searched only the area within reach of the driver's seat. Doc. 54-3 at ¶ 20; Doc. 54-2 at ¶ 13; Doc. 64-2 at Tr. 45-46.

Nicholas Austin (Tarantino's boyfriend and the father of her younger child), happened to drive by and stopped to see what was happening.  Tarantino estimates that she sat in the patrol car (with the door open so she could speak to and see her four-year old[12]) for about an hour while the officers searched her car until the point that Austin arrived.  Doc. 54-5 at 83, 94, 101.  Conley then turned his attention to Austin.  Doc. 54-6 at Tr. 23-24.  By all accounts, Austin was upset to find Tarantino being held, and his sometimes confrontational manner potentially posed a safety threat at the scene, thus warranting Conley's monitoring.  Meanwhile, Indorado completed his check of Tarantino's license documentation (ultimately finding it to be insufficient, presumably because she did not appear to be driving for an authorized business purpose on a Sunday evening at 6:00 p.m. with her children in the car); other deputies came and went; Andra Canfield, the female deputy, eventually arrived; a search of Tarantino of some kind ensued (more about that later); no drugs or weapons were found; Indorado issued Tarantino a criminal citation for the driving violation;[13] and she was permitted to leave in her own vehicle with her two children.

---

[12]Tarantino's one-year old remained asleep in her car seat in Tarantino's car throughout the stop.  Tarantino said some of the doors were opened during part of the time and two of the car windows remained open.  Doc. 54-5 at Tr. 96.

[13]Tarantino paid the citation, although she now contests that she committed the violation of driving with a suspended license.  That offense (Fla. Stat. § 322.16(1)(c)) is a second degree misdemeanor subject to a term of imprisonment of up to 60 days.  See Fla. Stat. §§ 322.16(5), 775.082(4)(b).  Because the offense was committed in Indorado's presence, he could have arrested Tarantino at the scene.  See Fla. Stat. § 901.15(1) (authorizing a warrantless arrest where a misdemeanor occurs in the presence of a law enforcement officer).

In United States v. Place, a case relied on by Tarantino, the Supreme Court explained that while the Court "decline[d] to adopt any outside time limitation for a permissible Terry stop," it had "never approved a seizure of the person for the prolonged 90-minute period involved" in that case, and could not do so on the facts presented.  462 U.S. 696, 709-10 (1983).  In Place, officers were waiting at LaGuardia Airport in New York to question an arriving passenger who had caused suspicion upon his departure from Miami.  After speaking with officers, the passenger refused to consent to a search of his luggage so officers brought his luggage to Kennedy Airport where a narcotics detection dog was available.  In holding that the stop was simply too long in the absence of probable cause, the Court stated that the officers could have done more to expedite the detention, including having the narcotics dog available at the airport where they knew the passenger they wished to question would be arriving.  Id. at 709.  Similarly, in United States v. Puglisi (another case relied on by Tarantino), the Eleventh Circuit found a 140 minute airport detention too long.  723 F.2d 779, 783 (11th Cir. 1984).  There too, the Court noted that law enforcement had alternatives that could have ameliorated the delay, such as having the drug dog at the airport, or permitting the suspect's bags to be sent on the flight to be sniffed by a drug dog at the arrival airport.  Id. at 790-91.

In this case, by contrast, Tarantino was initially restrained and detained for officer safety.  As described above, Conley thought she could have had a weapon stuffed into her shirt, which creates a permissible basis to restrain an individual during the course of a Terry stop.  Hastamorir, 881 F.2d at 1556-57.  Unlike the airport stops described in Place and Puglisi, this was a roadside traffic stop where officer safety is frequently jeopardized and

15

officers did not have the ability to plan ahead for what they would encounter.  Additionally, it was reasonable to call a female deputy to come conduct the patdown search of Tarantino, which both Indorado and Conley testified is the preferred manner of handling the patdown of a person of the opposite gender of the officer, especially where the officers were particularly concerned that she was hiding something in her bra.  While Canfield's arrival took longer than either officer expected, during the time they waited for her, they searched Tarantino's car to determine whether drugs or weapons had been within her reach, Indorado eventually completed his review of Tarantino's license documentation (a process that had been interrupted by the confrontation between Conley and Tarantino earlier), the officers had to keep the scene secure notwithstanding the arrival of Tarantino's angry boyfriend, and Tarantino's two small children had to be monitored.  While the officers in Place and Puglisi had alternatives to the courses of action they took, here, none were apparent or suggested by anyone.[14]  Thus, unlike the airport stops in Place and Puglisi, the sequence of actions the officers took here were calculated to ensure officer safety at the scene and to confirm or

---

[14]Perhaps instead of waiting for Canfield, the officers could have taken Tarantino to the station to find another female officer to conduct a patdown.  However, there was no testimony that a female officer would be there either.  Without knowing how far the scene was from the station, it is not clear whether this would have expedited the situation, especially where the officers believed Canfield, who was on patrol in the area, was on her way.  Additionally, it would have meant bringing Tarantino's small children with them had they all left the scene before Austin arrived.  While the officers understandably preferred to have a female deputy conduct the patdown of Tarantino, "[c]ourts have consistently found that there is no constitutional right to be patted down by a person of the same sex." Lozado v. City of New York, Case No. 12 Civ. 0038(ILG)(JMA), 2013 WL 3934998, *5 (E.D.N.Y. July 29, 2013) (quotation and citations omitted); see also Stokes v. City of New York, Case No. 05-CV-0007 (JFB)(MDG), 2007 WL 1300983, *12, n.9 (S.D.N.Y. May 3, 2007) (collecting cases).  Thus, at some point, an unduly long wait for a female deputy could ripen into a stop of excessive duration.

dispel their suspicions as to whether Tarantino was concealing drugs or a weapon. See United States v. Gil, 204 F.3d 1347 (11th Cir. 2000) (holding 75 minute detention of handcuffed female driver in back of patrol car did not violate Fourth Amendment where no female officer was available for patdown, driver could have had a weapon, officers were investigating the residence the driver had just left where they believed a large quantity of cocaine had just been delivered, and the officers' actions were calculated to pursue the object of their investigation while maintaining officer safety); cf., United States v. Codd, 956 F.2d 1109 (11th Cir. 1992) (affirming suppression of evidence and statements where officers held escaped inmate's wife for two and half hours at police station before formally arresting her).

However, even assuming arguendo that the delay caused by Canfield's late arrival (which necessitated Tarantino's two small children being held as well) was violative of the Fourth Amendment, the Court would find the officers to be protected by qualified immunity because, in light of the analysis above, it was not so clear that their actions would violate Tarantino's constitutional rights. See Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1306-08 (11th Cir. 2006) ("The Fourth Amendment's general proscription against 'unreasonable' seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances[;]" thus, the qualified immunity shield is usually only lifted on those "rare occasion[s]" where the officer's conduct "lay so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent . . . notwithstanding the lack of fact-specific case law.") (quotations and citations omitted). Officers Conley and Indorado are due to be granted summary judgment with regard to the

duration of the traffic stop.[15]

### 3.    Strip Search

Tarantino testified that once Canfield arrived, officers removed the handcuffs and, while Tarantino stood in the area framed between the back seat of the patrol car and the opened car door, Canfield performed a patdown search of Tarantino, after which Canfield announced that Tarantino needed to remove all of her clothing, including her hat, shoes, socks, shirt, pants, bra and underwear. Doc. 54-5 at Tr. 106-09. Tarantino did so[16] and told Canfield that she was menstruating. Id. at Tr. 109. Tarantino says that throughout the strip search, Indorado remained in the driver's seat of his patrol car, Canfield was facing Tarantino, and Conley and Hesse were behind Canfield watching Tarantino. Id. at Tr. 108. Tarantino says that after she removed all of her clothing she remained standing naked for approximately five minutes while motorists drove by before Canfield told her to get dressed and then spoke with the two officers who stood behind her (Conley and Hesse). Id. at Tr. 111-12, 156-57. Tarantino says that after the officers conferred, Canfield told Tarantino she needed to take off all her clothes again and remove the tampon too. Id. Tarantino states that while Canfield, Conley and Hesse continued to watch, she removed all of her clothing

---

[15]Whether the duration of this stop was ninety-four minutes, as the CAD records suggest, or two hours, as Tarantino estimates, it was a relatively long traffic stop. However, given the totality of the specific circumstances presented, it was not of excessive duration. The Court's view might be different if a stop of this length had been solely limited to the traffic violation. It was Tarantino's movement of her hand under her shirt that escalated the situation and caused the officers to lengthen the stop's duration.

[16]Tarantino had some difficulty recounting whether she removed her own clothing or whether Canfield removed them. See Doc. 54-5 at Tr. 106-07.

for the second time, at which point Canfield reached between Tarantino's legs, pulled out

Tarantino's tampon and dropped it to the ground.  Id. at Tr. 111-19.  Thereafter Canfield

directed Tarantino to get dressed and go sit in her own car.  Id. at Tr. 123.[17]

Tarantino claims all four officers are liable for the strip search, Canfield for conducting

it (Canfield does not argue for summary judgment on this point), Indorado for ordering it

without basis to do so, and Indorado, Conley and Hesse for not stopping it once they

observed it happening.[18]  Defendants point out that Tarantino testified that she "consented"

to the strip search and tampon removal (Doc. 54-4 at Tr. 122), though as she explained:

> It's not so much that I agreed because she [Canfield] did it.  It
> was just like I just- - I was dumbfounded.  I mean, I was at their
> beck and call because they're the police and they had me like
> subdued and my children were there.

Tarantino Depo, Doc. 54-5 at Tr. 117.

From her testimony, Tarantino did not protest but was surprised at the request to strip

and felt she did not have an alternative other than to comply.  Drawing inferences from her

---

[17]Although the Court credits Tarantino's version of these events for purposes of deciding these motions, the officers dispute much of her recitation, and deny that she was ever strip searched or naked.  A jury will have to decide what happened.

[18]Defendants contend the claims that Indorado is liable for ordering the strip search and that all three of the male officers are liable for failing to stop it are not raised in Tarantino's amended complaint.  See Doc. 81 at pp. 7-8.  The Court disagrees.  Count I (the section 1983 claim) sues all four deputies for violating Tarantino's Fourth Amendment rights during the frisk, restraint, detention and strip search.  Doc. 19 at ¶ 26.  That Count incorporates by reference the preceding paragraphs, including paragraph 18 (alleging the officers ordered the strip search) and paragraphs 22 and 23 (alleging the officers each had a duty to prevent their fellow law enforcement officers from violating the constitution and had an opportunity to intervene but failed to do so).  From this, the Court finds these claims are fairly raised within Tarantino's section 1983 claim.

testimony in the light most favorable to her, Tarantino did not consent to a strip search. Rather, it appears she felt compelled to be compliant so as to avoid having herself or her boyfriend arrested, especially because her children were present. See United States v. Walters, 591 F.2d 1195, 1200 (5th Cir. 1979) (finding traveler's consent to strip search not voluntary where she not did not believe she could refuse to cooperate); see also Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973) (explaining that consent to search must be "voluntarily given, and not the result of duress or coercion, express or implied"). Thus, the Court considers which, if any, of the officers could be held liable for a search that, taking the evidence in the light most favorable to Tarantino, violated the Constitution.

Canfield has not moved for summary judgment on this claim, recognizing that under Tarantino's version of the facts, Canfield's actions could not be reconciled with the Fourth Amendment. See Evans v. Stephens, 407 F.3d 1272, 1279-81 (11th Cir. 2005) (en banc) (holding that for a post-arrest strip/body cavity search, a law enforcement officer must have at least a reasonable suspicion that the person to be searched possesses contraband, that the contraband is reasonably suspected to be located in the area to be searched, and that the manner in which the search is conducted be reasonable) (quotation and citation omitted); Brent v. Ashley, 247 F.3d 1294, 1300 (11th Cir. 2001) (explaining in the context of a search of a traveler at the border that "as a search progresses from a stop, to a pat-down search, to a strip search, an agent must reevaluate whether reasonable suspicion to justify the next level of intrusion exists in light of the information gained during the encounter") (citation omitted); Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir. 1993) (joining other circuits in "recognizing a prisoner's constitutional right to bodily privacy because most people have a

20

special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating") (quotation and citations omitted); Justice v. City of Peachtree City, 961 F.2d 188, 192 (11th 1992) (citing Seventh Circuit authority describing a strip search as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission" and explaining that the reasonableness of a search is assessed from its context, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted") (citations omitted); see also McCloud v. Fortune, Case No. 4:05cv101-RH/WCS, 2005 WL 3274648,*2 (N.D. Fla. Dec. 2, 2005) (citing Evans and Brent for the proposition that it was clearly established that strip search of two female passengers along a public highway in full view of male officers would violate the Fourth Amendment).[19]

There is no contention that Conley, Indorado, or Hesse themselves conducted the search or touched Tarantino during the search. And, while officers who fail to intervene to protect a victim from another officer's unconstitutional act can be held liable under section

_____

[19]The Court does not mean to say that there could not be circumstances in which a detainee could be strip searched without violating the Fourth Amendment. However, taking the evidence in the light most favorable to Tarantino (as Canfield recognizes she must), officers found no evidence of drugs at the scene and Canfield found nothing during the patdown that would warrant any further intrusion, yet she proceeded to conduct a strip search of Tarantino on a public street during daylight hours in plain view of male officers and passing motorists. And Tarantino's presentation of the facts does not end there. As noted above, she contends she was ordered to strip not once, but twice, stood naked in the street for minutes at a time, and had a tampon forcibly removed from her vagina by a sheriff's deputy. If true, this evidence would likely "take the manner of the search[ ] well beyond the 'hazy border' that sometimes separates lawful conduct from unlawful conduct." Evans, 407 F.3d at 1283.

1983, such occasions appear to be narrowly limited to those involving the use of excessive force.  In Byrd v. Clark, 783 F.2d 1002 (11th Cir. 1986) (abrogation on other grounds recognized by Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000)), the Eleventh Circuit vacated an order of summary judgment and remanded for consideration of whether an officer "was in a position to intervene" where the officer allegedly stood by as his fellow officer had an altercation with the plaintiff in the course of an arrest that resulted in injuries to her hip and shoulder severe enough to require surgery. Id. at 1007.

As explained by the Eleventh Circuit, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Id.  While this broad "constitutional violation" language leaves open the possibly that liability for failure to intervene might obtain in contexts beyond those involving excessive force, its application within the Eleventh Circuit has been limited to excessive force cases.  For example, in Fundiller v. City of Cooper City, 777 F.2d 1436 (11th Cir. 1985), an officer shot Fundiller without provocation or warning while Fundiller sat in his car during the course of an undercover drug buy.  Id. at 1438.  Ten officers who were stationed nearby descended on the scene, dragged Fundiller from his vehicle, left him face down on the ground, and handcuffed him while shouting obscenities at him.  Id. at 1441.  Notwithstanding that Fundiller could not identify which of the ten officers was responsible for which act, the Eleventh Circuit reversed, holding that none of the officers were entitled to be dismissed, explaining:

22

> It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983.  Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.

Id. at 1441-42.  In Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972), a case relied on by the Eleventh Circuit in both Fundiller and Byrd v. Clark, the plaintiff, who had been shot, was taken into a back room of a bar with a dozen officers where he was "struck repeatedly," "could be heard screaming," and was handcuffed and thrown into a police wagon while "semiconscious." 466 F.2d at 9-10.  In reversing the dismissal of claims against the officers, the Seventh Circuit explained that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." Id. at 11.[20]

Eleventh Circuit decisions since Fundiller are to similar effect.  See, e.g., Bailey v. City of Miami Beach, 476 Fed. App'x 193, 196-97 (11th Cir. 2012) (no qualified immunity for officer who watched for two or three minutes while two of his fellow officers "attacked" plaintiff); Heflin v. Miami-Dade County, 393 Fed. App'x 658, 660 (11th Cir. 2010) (finding complaint stated a claim for failure to intervene against officers who were present when fellow officers entered man's home without consent, handcuffed him, pushed him to the

---

[20]The authorities relied on by the Eleventh Circuit in Byrd v. Clark and Fundiller present similar factual scenarios.  See Putnam v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981) (failure to intervene when another officer hit prisoner with his gun several times); Harris v. Chanclor, 537 F.2d 203, 206 (5th Cir. 1976) (failure to intervene when plaintiff was "viciously beaten" by another officer); Bruner v. Dunaway, 684 F.2d 422 (6th Cir. 1982) (failure to intervene when plaintiff was repeatedly struck and kicked until he was carried away by ambulance).

ground, and dragged him out of the house);  Priester v. City of Riviera Beach, Fla., 208 F.3d

919, 923-25 (11th Cir. 2000) (no qualified immunity for officer who watched fellow officer's

police dog attack on command for as long as two minutes without intervening).

The Court has found no United States Supreme Court or Eleventh Circuit authority,

and the parties have cited none, in which a section 1983 action for failure to intervene

survived based on a theory not involving the use of excessive force.  See Jones v. Cannon,

174 F.3d 1271, 1286 (11th Cir. 1999) (recognizing availability of failure to intervene in the

context of excessive force cases (citing Fundiller) but rejecting its application as a basis of

liability under section 1983 against officer who failed to stop another officer who fabricated

a confession to include in a police report); Exford v. City of Montgomery, 887 F.Supp.2d

1210, 1225-26 (M.D. Ala. 2012) (noting that failure to intervene cases deal with excessive

force, not unlawful arrest, and, without Supreme Court, Eleventh Circuit or state Supreme

Court authority to the contrary, qualified immunity protected officer where his fellow officer

allegedly pushed plaintiff, arrested him without probable cause, and included false

statements on police report); Mehta v. Foskey, 877 F.Supp.2d 1367, 1377 (S.D. Ga. 2012)

(dismissing section 1983 claim that officers failed to intervene in unlawful search where

"[p]laintiffs cannot point to any controlling authority that requires a law enforcement officer

to intervene to prevent another officer from performing an unlawful search").  But see

Wilkerson v. Seymour, 736 F.3d 974, 979-80 (11th Cir. 2013) (declining to find liability as to

non-arresting officer but noting that Jones v. Cannon did not foreclose all possibility that a

failure to intervene theory of section 1983 liability could be available in a false arrest case

if an officer "knew the arrest lacked any constitutional basis and yet participated in some

way"); Lepone-Dempsey v. Carroll County Com'rs, 159 Fed. App'x 916, 919-20 (11th Cir. 2005) (permitting failure to intervene theory to go to trial where officer allegedly failed to intervene in unlawful arrest, but noting that use of excessive force was subsumed within the claim).

The parties have cited two Northern District of Florida opinions which leave open the possibility for expanding failure to intervene liability beyond the excessive force context. See Prosper v. Fla. Dep't of Corr., Case No. 5:09cv256/MCR/MD, 2010 WL 1380374 (N.D. Fla. Feb. 24, 2010) (rejecting theory that warden could be held liable under section 1983 for failure to intervene to prevent conspiracy involving inmate mail policy because warden was not in a position to intervene (which might assume, arguendo, that the theory could otherwise be available on those facts)); McCloud v. Fortune, Case No. 4:05cv101-RH/WCS, 2005 WL 3274648, *3 (N.D. Fla. Dec. 2, 2005) (finding that officers who failed to intervene in a roadside strip search could not be held liable under such a theory because the record did not establish that the officers were in a position to intervene; but further noting that even if they were in such a position, it was not clearly established at the time that an officer standing by in those circumstances had a duty to intervene).

A few other district court decisions within the Eleventh Circuit have permitted section 1983 claims to survive summary judgment on a theory of failure to intervene in an unlawful strip search.  In Sampson v. Reed, Case No. 1:12-cv-500-TWT, 2013 WL 1320508 (N.D. Ga. Mar. 28, 2013), the plaintiff sued four officers who were members of a police unit known as the "Red Dogs" whose aggressive search policy including conducting "strip searches of as many suspects as possible." Id. at *1, *3.  Plaintiff was grabbed by members of the Red

Dogs while crossing the street in a public parking area in the late afternoon near a mall. Id. at *8.  One officer stood by while two officers held plaintiff's arms and the fourth pulled down plaintiff's pants and underwear, "spread his buttocks apart and looked and then moved his genitals and testicles apart and looked." Id. at *1, *8.  At least three witnesses observed the search.  Id. at *8.  Officers did not suspect the plaintiff harbored drugs, weapons or contraband and therefore had no justification for performing the search and arguably did it simply "in order to humiliate him." Id. at *8.   Plaintiff sued under section 1983 and on state law battery charges, among others. Id. at *2.   In holding that the officer who merely observed could be tried on a theory of failure to intervene, the court acknowledged that the theory's application had been limited to cases involving excessive force, yet announced that "there is no indication that the same liability principles would not apply to [plaintiff's] claim" and found that the jury could find that the officer's presence at the scene "amounted to participation in the strip search." Id. at *6, n.4.  See also Sims ex rel. Sims v. Forehand, 112 F.Supp.2d 1260, 1274-75 (M.D. Ala. 2000) (denying summary judgment based on disputed issues of fact as to whether officer in charge ordered male officer to unlawfully strip search female and/or failed to prevent it).

The Court also uncovered some out-of-Circuit authorities permitting claims to go forward outside the excessive force context under a doctrine labeled "bystander liability." See, e.g., Randall v. Prince George's County, Md., 302 F.3d 188, 203-04 (4th Cir. 2002) (holding officers liable for failing to stop unlawful detentions, explaining that although liability based on "omission is a disfavored concept," an officer may be liable under a theory of "bystander liability" where he "knows that a fellow officer is violating an individual's

constitutional rights;" "has a reasonable opportunity to prevent the harm;" "and . . . chooses not to act"); Hamilton v. Turner, Case No. 3:13-cv-240, 2014 WL 1513355, **2-4 (S.D. Tex. April 16, 2014) (finding bystander liability claim could proceed against officer who watched vaginal and anal cavity searches of two handcuffed female suspects in back seat of patrol car while one of them "yell[ed] in agony" and cried, and where officer knew cavity search was about to take place); Haynes v. City of Durham, N.C., Case No. 1:12cv1090, 2014 WL 2864470, (M.D.N.C. June 24, 2014) (finding plaintiff stated a claim of bystander liability against officers who were present when drug dogs failed to alert yet fellow officers detained plaintiff for several hours while search turned up nothing, eventually arresting plaintiff on drug charges).

However, while the stated elements of a bystander liability claim under section 1983 seem to extend beyond excessive force claims, whether the doctrine is styled as "bystander liability" or "failure to intervene," the actual applications appear to be largely limited to excessive force cases even outside the Eleventh Circuit. See, e.g., Simcoe v. Gray, __ Fed. App'x ___, 2014 WL 4211272, *1 (2d Cir. Aug. 27, 2014) (reversing grant of summary judgment where plaintiff claimed two officers failed to intervene when a third officer "yanked on [plaintiff's] arm," "repeatedly smashed his face into the ground and stood on his hands after he was handcuffed"); Tooley v. Young, 560 Fed. App'x 797, 801, n.3 (10th Cir. 2014) (describing failure to intervene doctrine under section 1983 as imposing "liability on an officer who is aware of *excessive force* being used by other officers, is in a position to intervene and does nothing) (emphasis supplied) (citing First, Eighth and Tenth Circuit authorities all involving failures to intervene when fellow officers used excessive force); Whitley v. Hanna,

27

726 F.3d 631, 646-48 (5th Cir. 2013) (discussing bystander liability claim against officer who failed to stop fellow officer from sexually abusing plaintiff, but finding officer did not "acquiesce" in abuse where he was investigating fellow officer and arrested him before abuse went further); Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994) (finding officer could be liable for failing to stop fellow officer who shoplifted, tried to run over, and then punched store owner); Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (finding officer could be liable for failing to stop fellow officer from beating suspect).

The three male officers do not foreclose the possibility that a failure to intervene theory is available outside the excessive force context.  Rather, they chiefly rely on the absence of evidence that they were each in a position to intervene.  See Docs. 54, 55, 56 (motions of Indorado, Conley and Hesse) (citing Jones v. City of Dothan, Ala., 121 F.3d 1456, 1460 (11th Cir. 1997) and Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) for the proposition that a law enforcement official may be liable for failing to intervene in the face of a constitutional violation if he is in a position to intervene).  As discussed above, Byrd v. Clark was an excessive force case.  Jones v. City of Dothan is to similar effect.  There, an officer faced a Fourteenth Amendment substantive due process claim for failing to intervene when a fellow officer allegedly used excessive force against a suspect's wife.  121 F.3d at 1461.  The Eleventh Circuit reversed an order denying summary judgment finding the amount of force used was minimal, the injury was negligible and that, even if the force was excessive, the officer was entitled to qualified immunity since there was no "case clearly establishing that he had a duty to intervene" in his fellow officer's actions.  Id.

Thus, at best it appears the law is undecided as to whether a failure to intervene claim is available where excessive force is not involved and the Court therefore cannot say that law enforcement officers commit a constitutional violation when they fail to prevent another officer's unlawful search.  Taking the evidence in the light most favorable to Tarantino, the incident here was an aggressive search but it did not involve the type of force seen in excessive force cases such as those cited above where failure to intervene can create liability under section 1983 in the Eleventh Circuit.  Under the current state of the law, this Court cannot say that Conley, Indorado and Hesse committed a constitutional violation by failing to intervene to stop Canfield from conducting the strip search of Tarantino.

Alternatively, to the extent failure to intervene does violate the Constitution in these circumstances, the officers would be protected by qualified immunity because no United States Supreme Court, Eleventh Circuit or Florida Supreme Court authority would have put them on notice that their failure to act would be a constitutional violation.  See Tolan, 134 S.Ct. at 1866 ("The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation.") (citation omitted); Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1102, n.14 (11th Cir. 2014) ("Only cases from the United States Supreme Court, [the Eleventh Circuit] and the highest state court under which the claim arose can clearly establish the law in our Circuit.") (citation omitted).  "[O]fficials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." Gilmore v. Hodges, 738 F.3d 266, 278 (11th Cir. 2013) (quotation and citation omitted).  Rather, the precedent must "truly compel[ ] the conclusion for all reasonable, similarly situated public officials that what Defendants were doing violated [the plaintiff's]

federal rights in the circumstances." Id. (quotation and citations omitted). Thus, "the qualified immunity standard demands that the defendant cross a bright line that is not found in abstractions– to act reasonably, to act with probable cause, and so on– but in studying how these abstractions have applied in concrete circumstances." Jones, 121 F.3d at 1459 (quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993), modified, 14 F.3d 583 (11th Cir. 1994)).[21]

---

[21]This case does not fall in the category of a constitutional violation that is so obvious that there need not be on-point precedent to establish the violation. See, e.g., Evans, 407 F.3d at 1283 (holding that manner of strip search was an "obvious" violation notwithstanding the lack of specific case law, where officer threw two men together in a broom closet, required them to strip naked, and forcefully probed their anuses and lifted their testicles with a baton while using threatening and racist language). Failing that, for a constitutional right or violation to become "clearly established" in the first place, it must be so declared by the state Supreme Court, a federal Circuit Court or the United States Supreme Court. See, e.g., Gilmore, 738 F.3d at 276-278 (holding that substantial hearing loss that could be remedied by a hearing aid is a serious medical need which, *going forward*, a jailer's failure to address could create section 1983 liability under the Eighth Amendment, but finding defendants to be protected by qualified immunity because no state Supreme Court, Eleventh Circuit or United States Supreme Court decision had previously so held) (emphasis added).

While a federal district court has no authority under section 1983 jurisprudence to be the first to declare certain law enforcement misconduct to be a constitutional violation, this Court may at least recognize the issue in the event that either the Eleventh Circuit or the Supreme Court decides to consider it. Given that failure of a law enforcement officer to intervene in the excessive force context can rise, in some circumstances, to a constitutional violation, see, e.g., Fundiller, 777 F.2d at 1441-42, discussed supra, there may well be scenarios outside of the excessive force context in which an officer's failure to intervene in another officer's misconduct might also give rise to constitutional liability. See pages 21-29, supra. Although the facts of the alleged strip search here are highly disputed, taking the evidence in the light most favorable to Tarantino, here is what happened:

> Tarantino was ordered out of Indorado's car and subjected to a patdown search by Canfield. Finding nothing, Canfield then ordered Tarantino to remove every bit of her clothing while two other male officers watched and a third was in the front seat of the patrol car. Tarantino stood naked next to the back seat in the corner of the opened car door during daylight hours on a

Moreover, even if the removal of Tarantino's tampon was deemed to be excessive

force as that term is used,[22] that single act was not the type of repeated force that could be

---

> residential street for up to five minutes before Canfield told her to get dressed.  After conferring with the two officers, and while they were still watching, Canfield then directed Tarantino to remove all of her clothing for a second time, and, once Tarantino was fully naked, Canfield reached down and removed Tarantino's tampon, dropping it to the street before telling Tarantino to get dressed.

If this scenario be proven, it could well be a Fourth Amendment violation for other officers to stand idly by allowing this search to continue unabated and indeed, to exacerbate it by personally observing Tarantino's naked state, contributing to the humiliation and degradation of this highly public strip search.  See Sampson, 2013 WL 1320508, *6, n.4 (finding same liability principles governing failure to intervene in excessive force cases could apply to failure to intervene in unlawful search).  Also to be considered would be whether, having failed to intervene as to the first strip search, the other officers had a constitutional duty to at least prevent the second one.

[22]A doubtful scenario, given the Eleventh Circuit's reaffirmance of "the principle that the application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."  Nolin v. Isbell, 207 F.3d 1253, 1258 (11th Cir. 2000).  In Nolin, the Court found the force applied fell "well within the ambit of the de minimus force principle" where the officer, in effecting an arrest, "merely grabbed Appellee and shoved him a few feet against a vehicle, pushed [the officer's] knee into Appellee's back and Appellee's head against the van, searched Appellee's groin area in an uncomfortable manner, and placed Appellee in handcuffs."  Id. at 1258, n.4.  Admittedly, the facts here differ in that, unlike the arrestee in Nolin, Tarantino was not being arrested, and any force could be "excessive" if the stop and search itself were unlawful.  Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000) (explaining "there is no basis for any . . . use of force" if a stop is illegal).  However, as Jackson explains, under Eleventh Circuit precedent, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim."  Id.  Thus, the removal of Tarantino's tampon involved de minimus force that would not convert her claim into one for excessive force under the Fourth Amendment.  Any injury from the use of force in the course of an unlawful stop is simply an element of damages in an unauthorized search and seizure claim under section 1983.  Id.; Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1332 (11th Cir. 2006) (citing Jackson as authority to affirm judgment for defendants on excessive force claim because it was subsumed within unlawful arrest claim where officers grabbed plaintiff's arm, attempted to spray him with pepper spray, threw him to the ground and handcuffed him).

stopped by intervention.  <u>See</u> <u>Brown v. City of Huntsville, Ala.</u>, 608 F.3d 724, (11th Cir. 2010) (officer could not be liable under theory of failure to intervene where fellow officer pushed non-resisting cooperative plaintiff back into car and spayed her with pepper spray); <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1331 (11th Cir. 2008) (officer could not be liable for failure to intervene where he had no ability to stop his fellow officer from throwing a single punch). Officers Conley, Indorado, and Hesse's motions for summary judgment are due to be granted as to the claim that they failed to intervene when Canfield conducted a strip search.[23]

Tarantino additionally claims that Indorado can still be held liable because he ordered the strip search.  If true, this might provide a basis for constitutional liability.  <u>See</u> <u>Myers v. Bowman</u>, 713 F.3d 1319, 1328-29 (11th Cir. 2013) (holding that supervisors can be liable under section 1983 when there is a causal connection between actions of the supervising official and the alleged constitutional violation) (quotation and citations omitted).  However, even in the light most favorable to Tarantino, she did not overhear any conversation in which this order allegedly took place; rather, she suggests in her brief that Indorado's purpose in calling Canfield to come to the scene must have necessarily been to have her conduct a strip

---

[23]Hesse has alternatively moved for summary judgment on the grounds that he was following the lead of primary officers who were in charge at the scene, citing <u>Shepard v. Hallandale Beach Police Dep't</u>, 398 Fed. App'x 480, 483 (11th Cir. 2010) ("This Court has concluded that assisting officers during a search are entitled to qualified immunity when there is no indication that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a Fourth Amendment violation, even when the primary officer is not entitled to qualified immunity.") (citation omitted) and <u>Brent v. Ashley</u>, 247 F.3d 1294, 1305-06 (11th Cir. 2001) (holding officers were protected by qualified immunity where they had made no decisions related to strip search and did not act unreasonably in following lead of other officers who were in charge).  In light of the previous ruling, the Court has no need to reach this alternate ground.

search.  Doc. 64 at p. 17.   The Court finds no support for this in the record and in fact,

Conley, Indorado and Canfield testified that their usual practice is to call another deputy to

conduct a patdown when the person to be searched is of the opposite gender.  Doc. 54-6

at Tr. 30; Doc. 64-2 at Tr. 41; Doc. 64-3 at Tr. 40-41, 43-44.  Indorado further stated that in

the event Tarantino consented to a search beyond the patdown, they would want a female

deputy at the scene to handle it.  Doc. 64-2 at Tr. 41.  Additionally, while both Indorado and

Canfield reported that they may have conferred at some point after Canfield arrived, neither

of them testified that Indorado directed Canfield to remove Tarantino's clothing or tampon

or that he knew that she was going to do so.  While Tarantino may speculate that the

conversation was otherwise, there is no evidence or possible inference to support her

speculation.[24]  Thus, Tarantino has failed to create a disputed issue of fact as to whether

Indorado ordered Canfield to conduct a strip search of Tarantino;  Indorado must be granted

summary judgment as to this claim.  See Myers, 713 at 1327 (affirming summary judgment

and rejecting argument that one officer directed the other to effect an arrest where it was

based on "speculation and conclusory allegations" "without specific supporting facts" and

thus had "no probative value"); Gonzalez v. Reno, 325 F.3d 1228, 1235-36 (11th Cir. 2003)

(finding qualified immunity protected supervisors from plaintiff's "vague and conclusory

allegations" that they directed an unlawful search).

---

[24]Indorado's statement that any search beyond a patdown should be conducted by a female is insufficient for a jury to find that he ordered a strip search.

**B.      Count III: Battery Claim**

Count III of Tarantino's amended complaint is a state law claim for battery against each of the four officers resulting from their alleged "physical assault" on Tarantino during the strip search.  See Doc. 19 at ¶¶ 34-41.  Canfield does not move for summary judgment on the battery claim and Tarantino concedes that Indorado, Conley and Hesse are entitled to summary judgment on it.  See Docs. 57 & 64.  Thus, the Count III battery claim will proceed as to Canfield only.

**C.      Count IV: Intentional Infliction of Emotional Distress**

In Count IV of her amended complaint, Tarantino sues all four officers under Florida law for intentional infliction of emotional distress.  See Doc. 19 at ¶¶ 42-50.  Canfield does not move for summary judgment on this claim and Tarantino argues that Indorado, Conley and Hesse's motions should be denied.  In her amended complaint, Tarantino alleges these officers "had non-consensual, offensive physical contact with plaintiff, which included a strip search of plaintiff in public and in front of male police officers and in an unsanitary and disgraceful manner."  Id. at ¶ 44.  Tarantino testified that Conley and Hesse taunted her before Canfield arrived and then watched while she stood naked at the side of the road while motorists drove by during daylight hours.  Doc. 54-3 at Tr. 120, 131.[25]  She testified that she has suffered from anxiety following the incident.  Id. at Tr. 138.  Indorado, Conley and Hesse

---

[25]Tarantino did not include allegations of taunting in this Count but the Court considers them as part of the conduct she contends supports this claim.  Tarantino stated that the three male officers did not speak to her during the strip search; their remarks were presumably made before Canfield arrived since Tarantino got dressed and sat in her own car after the search.  Doc. 54-5 at Tr. 113.

argue they are entitled to statutory immunity under Florida law and that even if statutory immunity is not available, Tarantino has insufficient evidence to prosecute this claim.

Florida Statute Section 768.28(9)(a) provides generally that no officer of the state or its subdivisions shall be held personally liable in tort for any injury or damage suffered as a result of any act in the scope of his employment unless the officer acted in bad faith or with a malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property.  Tarantino argues that questions of whether an officer acted in such a manner are factual matters to be left to a jury.  However, in the cases she cites (McGhee v. Volusia County and Swofford v. Eslinger) the courts were asked to apply the immunity to a situation where officers allegedly used excessive force and, not surprisingly, in the face of disputed evidence about those incidents, the courts were also faced with disputes as to whether the officers acted "in bad faith or with a malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property" as required by the statute. See McGhee v. Volusia County, 679 So.2d 729, 730 (Fla. 1996) (describing plaintiff's testimony that the officer lunged at him, grabbed him by the throat, and began kicking him with force); Swofford v. Eslinger, 671 F.Supp.2d 1289, 1294 (M.D. Fla. 2009) (describing incident where officers shot a homeowner in the course of investigating a car burglary). See also Kastritis v. City of Daytona Beach Shores, 835 F.Supp. 2d 1200, 1225-26 (M.D. Fla. 2011) (finding that evidence of the scope and intrusiveness of the strip search which precluded grant of qualified immunity on section 1983 claim could also support a finding of willful/purposeful and wanton conduct as to preclude grant of statutory immunity as to claims

of battery and intentional infliction of emotional distress).[26]

Here, by contrast, Tarantino's intentional infliction of emotional distress claim is limited to allegations regarding a strip search in which none of these officers actually participated and with regard to which the most that can be said is that they observed it happening and did not stop it.  (And again, Canfield, who allegedly performed the strip search, did not move for summary judgment on this claim and is prepared to defend it at trial.)  The Court finds there to be no evidence that the actions of the male officers fell outside the protection of statutory immunity provided by Florida law.  See McCloud, 2005 WL 3274648, *3 (holding that officers were protected by statutory immunity under Fla. Stat. § 768.28(9)(a) against plaintiffs' claim for intentional infliction of emotional distress "[f]or the same reasons" the officers were not liable under § 1983 for failing to intervene in the strip searches).

Even if the officers were not protected by statutory immunity under Florida law, to prove her claim for intentional infliction of emotional distress, Tarantino must demonstrate as to each of these officers that they (1) acted recklessly or intentionally; (2) by conduct that was extreme and outrageous; (3) which caused Tarantino's emotional distress; (4) and that her emotional distress was severe.  Johnson v. Thigpen, 788 So.2d 410, 412 (Fla. 1st DCA 2001).  To meet the outrageousness standard, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

---

[26]The strip searches in Kastritis were in violation of the Fourth Amendment where the officer, acting on instructions from her superior to "search" the dancers and female bartenders while executing a search warrant, strip searched each one of them notwithstanding that there was no evidence any of them had weapons or contraband.  835 F.Supp.2d at 1216-1221.

regarded as atrocious and utterly intolerable in a civilized community" such as would lead "an average member of the community" to exclaim, "Outrageous!" Id. at 412-13 (citing Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 278-79 (Fla. 1985)).  "Florida courts use a very high standard in evaluating whether the facts alleged are sufficiently outrageous to support a claim for intentional infliction of emotional distress." Foreman v. City of Port St. Lucie, 294 Fed. App'x 554, 557 (11th Cir. 2008) (citing McCarson) (holding that officer's pointing an unloaded BB gun at the husband's chest and pulling the trigger while wife, who thought gun was loaded, watched, was not sufficiently outrageous under this standard). See also Frias v. Demings, 823 F.Supp.2d 1279, 1289 (M.D. Fla. 2011) (holding that officer's conduct may have caused embarrassment but was not sufficiently outrageous under Florida law to support an IIED claim where officer followed unarmed witness into her apartment, grabbed her arms, handcuffed her and took her out to his patrol car, notwithstanding that she was only wearing a towel).  "The issue of whether a plaintiff has met the requirements . . . in a claim for intentional infliction of emotional distress is a question for the trial court to decide as a matter of law." Johnson, 788 So.2d at 413.

None of these three officers are alleged to have touched Tarantino during the search.[27]  They did not direct or conduct -- intentionally, recklessly or otherwise-- a strip search of Tarantino.  What these defendants are charged with is watching while Canfield conducted a strip search of Tarantino and, as to Conley and Hesse, taunting Tarantino

---

[27]The only physical contact by any of them during the entire stop occurred when Indorado placed handcuffs on Tarantino.

throughout the stop, except during the time that she was naked.[28]  If true, their actions would surely contribute to Tarantino's embarrassment and feeling of degradation caused by the action of Canfield.  As a matter of law, however, the Court cannot find their conduct would meet the "very high standard" of outrageousness required to prove this claim.  Foreman, 294 Fed. App'x at 557.  Conley, Indorado and Hesse's motions for summary judgment are due to be granted as to this claim.

## III.   Conclusion

1.      Defendant Nick Hesse's Motion for Summary Judgment (Doc. 54), defendant Stephen Conley's Motion for Summary Judgment (Doc. 55), and defendant Thomas Indorado's Motion for Summary Judgment (Doc. 56) are **GRANTED**.  Pursuant to Fed. R. Civ. Pro. 54(b) the clerk is directed to delay entry of judgment in favor of these defendants until the conclusion of the case.

2.      Defendant Andra Canfield's Motion for Partial Summary Judgment (Doc. 57) is **GRANTED**.  This case will now proceed to trial against defendant Andra Canfield only on the section 1983 Count I claim that Canfield conducted an unlawful strip search of plaintiff Leila Tarantino, and on the state law claims for battery, Count III, and intentional infliction of emotional distress, Count IV.

---

[28]Tarantino's description of the taunting is that Conley and Hesse said things like:  "Who do you think you are?"; "Why do you wear your clothes like that?"; "You're not 16"; "You need to grow up."  See Doc. 54-5 at Tr. 131. While it could certainly be intimidating to have law enforcement officers speak to her in such a manner, those remarks are simply not of the kind that meet the standard.  See, e.g., LeGrande v. Emmanuel, 889 So.2d 991, 995 (Fla. 3d DCA 2004) (affirming dismissal of IIED claim where congregants' statements to congregation that pastor was "Satan" and was stealing from church were unsettling, embarrassing and humiliating, but were not extreme and outrageous).

3.      By separate Order, the Court will approve the parties' consent to jurisdiction of this matter by the assigned United States Magistrate Judge who will conduct the trial of Tarantino's claims against defendant Canfield.[29]

**DONE AND ORDERED** at Jacksonville, Florida this 4th day of September, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

Honorable Philip R. Lammens
United States Magistrate Judge

counsel of record

---

[29]Though the Court has granted summary judgment as to the other officers and as to the other claims regarding the stop and detention, this ruling does not limit the discretion of the Magistrate Judge, who will be trying the case, to admit such evidence of the other officers' actions and the circumstances leading up to, and including, the alleged strip search as is necessary to give context and perspective to the claims to be tried.